AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 JUN 30 PM 4: 42

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The Dodd Rehabilitation Center, located at Medical Center<br>Drive, Columbus, OH 43210, room numbers S-2080,S-2082,<br>S-2087 and S-2031 AND Ohio State McCampbell Outpatient<br>Care, Room No 503, located 1581 Dodd Dr. Columbus, OH | Case No.    2:20 mj. 460 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 666 | Grant Fraud |
| 18 U.S.C. § 1001(a)(1) | Engaging in a scheme to conceal a material fact or facts |

The application is based on these facts:

See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Timothy S. Saordins
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 6/30/2020

_____
*Judge's signature*

City and state: Columbus, OH

Elizabeth Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR _____

IN THE MATTER OF THE SEARCH OF
The Dodd Rehabilitation Center, located at
Medical Center Drive, Columbus, Ohio 43210,
room numbers S-2080, S-2082, S-2087 and S-
2031.

AND

Ohio State McCampbell Outpatient Care,
Room No 503, located 1581 Dodd Drive,
Columbus, Ohio 43210

Case No. _____

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Special Agent Timothy S. Saunders, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. As set forth in detail below, federal law enforcement is conducting an investigation into the possible violations of federal criminal laws by The Ohio State University (OSU) employee Song Guo Zheng (ZHENG). In particular, Your Affiant submits that the facts herein establish probable cause to believe ZHENG is in violation of 18 U.S.C. § 666 (Theft or Bribery Concerning Programs Receiving Federal Funds) and 18 U.S.C. § 1001 (False Statements) (referred to as the SUBJECT OFFENSES).

2.      I make this Affidavit in support of an application for a warrant to search the premises known and described lab space used by ZHENG and his research team[1] at OSU Dodd Rehabilitation Center, located at Medical Center Drive, Columbus, Ohio 43210, specifically, room numbers S-2080, S-2082, S-2087 and S-2031 and ZHENG's office located at the following address: Ohio State McCampbell Outpatient Care, Room No 503, located 1581 Dodd Drive, Columbus, Ohio 43210 (the SUBJECT PREMISES), further described in the following paragraphs and in Attachment A, for the things described in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES and to seize evidence of criminal conduct of ZHENG, and other co-conspirators, known and unknown.

3.      This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## AGENT BACKGROUND

4.      I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI) since October 2008, and I am currently assigned to the Cincinnati Division, Columbus Resident Agency, as a member of the Counterintelligence Squad. I am responsible for investigating, among other crimes, the theft or bribery concerning programs receiving federal funds. I have received both formal and informal training in the detection and investigation of said offense. As a result of my training and experience, I am familiar with the federal laws relating to the theft or bribery concerning programs receiving federal funds. I have participated

---

[1] According to OSU, ZHENG's research team consisted of: Lab Manager Juhua (Julie) Wang and J-1 Scholars and researchers Qiannan Fang (Fang), Ximei Zhang (Zhang), Ye Chen (Chen) and Youqiu Xue (Xue) (collectively, the J-1 Scholars).

2

in various investigations, including those with a foreign counterintelligence nexus. As a federal agent, I am authorized to investigate violations of the laws of the United States.

5.     I have personally participated in the investigation described herein. I have reviewed the relevant documents and reports of witness interviews during the course of this investigation. The statements contained in this Affidavit are based on my own observations, document reviews, and reliable information provided to me by other law enforcement officials. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to search the property described below, I have not included each and every fact learned during the course of this investigation. Rather, I have set forth those facts that I believe are necessary to establish probable cause for the search warrant sought. Where actions, conversations, and statements of others are related, they are related in part, except where otherwise indicated.

## APPLICABLE STATUTES AND DEFINITIONS

6.     I am advised that:

a. Title 18, United States Code, Section 666(a)(1)(A) states, in relevant part:

(a) Whoever, if the circumstances described in subsection (b) of this section exists—

(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

(A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—(i) is valued at $5,000 or more, and (ii) is owned by, or is under the care, custody, or control of such organization, government or agency . . . shall be fined under this title, imprisoned not more than 10 years, or both.

3

b.      Title 18, United States Code, Section 666(b) states, in relevant part: "The circumstances referred to in subsection (a) . . . is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant . . . ."

c.      The provisions of 18 U.S.C. § 666 and its subparts cover, among other crimes, the crimes of embezzlement, fraud, or conversion, so far as those crimes concern any property, regardless of whether the property itself can be traced directly as federal property—as long as the owner of the property, which is an organization, or State or local government, received $10,000 in federal funds, and so long as the property is valued at $5,000 or more. *See, e.g., United States v. Valentine*, 63 F.3d 459, 464 (6th Cir. 1995) ("Thus, we find that the statute does not require the government to demonstrate the federal character of stolen property. The statute addresses the relationship between the federal government and the local government from which the property was stolen, not the relationship between the federal government and the converted property.")

7.      Title 18, United States Code, Section 1001(a) provides, in relevant part, that "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact" or "makes any materially false, fictitious, or fraudulent statement or representation" is in violation of federal law.

**PRIOR APPLICATIONS**

8.      On or about 5/15/2020, an e-mail search warrant of ZHENG's OSU e-mail accounts, signed by US Magistrate Judge Chelsey M. Vascura, was issued in the Southern District of Ohio.

4

9. On or about 5/22/2020, a physical and electronic search warrant was signed by a Magistrate Judge in the US District Court for the District of Alaska.

10. On 5/23/2020, a criminal complaint and arrest warrant, signed by US Magistrate Judge Chelsey M. Vascura, was issued in the Southern District of Ohio for ZHENG.

11. On or about 5/29/2020, an e-mail search warrant of ZHENG's yahoo e-mail account, songguozheng@yahoo.com, signed by US Magistrate Judge Chelsey M. Vascura, was issued in the Southern District of Ohio.

## PROBABLE CAUSE

### Overview

12. I am currently investigating ZHENG for committing grant fraud (18 U.S.C. § 666) and engaging in a scheme to conceal a material fact or facts (18 U.S.C. § 1001(a)(1)) related to more than approximately $4,100,000 in grant funding that ZHENG and his research group(s) received from the National Institutes of Health (NIH). As described in greater detail below, ZHENG applied for and received NIH funding while working at the University of Southern California (USC), Pennsylvania State University (PSU), as well as OSU. As also described below, ZHENG was required to disclose conflicts of interest and receipt of other support in NIH grant applications, but failed to disclose that he was also employed at Sun Yat-Sen University (SYSU) in China and was also the recipient of funding from the People's Republic of China (PRC) through various PRC "Talent Plans" as well as from the National Natural Science Foundation of China (NNSFC), as explained below.

13. Specifically, NIH revealed that ZHENG has received funds and serves as the Principal Investigator (PI) on two active NIH awards, R01 AR059103, with funds totaling

5

approximately $3,450,000, and R61 AR073049, with funds totaling approximately $650,000. ZHENG also has one pending NIH award, R01 AR077009, for which he has not yet received funds. In addition, based upon open source information derived from ScienceNet.cn[2], accessed by NIH on 4/14/2020 (fund.sciencenet.cn), NIH noted ZHENG also appears to have received funding from and is listed as the Project Manager (PM) on at least three NNSFC grants which have overlapping timeframes with NIH grants R61 AR073049 and R01 AR059103. This overlap was disclosed by ZHENG to NIH. The NNSFC grants associated with ZHENG include Numbers 30728007, 81871224, and 81671611. As part of the NIH Grant applications, ZHENG made either untimely, incomplete or no disclosure of foreign components, foreign affiliation, or foreign funding, potentially violating Title 18, United States Code, Sections 666 and 1001.

**Background on ZHENG**

14.     Your Affiant confirmed the following information through communications with OSU, a review of OSU records, as well as documentation obtained from NIH. ZHENG works as a professor and researcher at OSU in the field of Rheumatology and Immunology and has been with the university since approximately January 2019. Prior to joining OSU, ZHENG was a Professor of Medicine and Director of Rheumatology Research in the Department of Medicine at PSU Hershey College of Medicine from approximately 2013 – 2019. Prior to PSU, ZHENG was a post-doctoral fellow, Assistant Professor and an Associate Professor at the Keck School of Medicine, Division of Rheumatology at USC from approximately 2000 – 2012.

---

[2] According to its Wikipedia page, ScienceNet.cn is a science virtual community and science blog that is supported by the Chinese Academy of Sciences (CAS) and the NNSFC with a mission of establishing a global Chinese science community.

**Background on NIH Funding**

15.     In order to receive NIH funding, non-NIH research institutions must submit a detailed application describing, among other things, the purpose and scope of the proposed research, the amount of funding requested, and how the funding will be used. Both during the application process and periodically after an award is made, the institution must also disclose to NIH all foreign collaboration and foreign sources of research support, including, but not limited to, research grants, cooperative agreements, contracts and/or institutional awards.[3] Additionally, NIH requires research institutions to identify and disclose to NIH significant (typically greater than $5,000) financial conflicts of interest (COI) by investigators (that is, the person or persons responsible for the design, conduct, and reporting of research), including those related to funds received from a foreign institution of higher education or the government of another country.[4] Although it is the research institution itself that submits the grant application and all other grant-related disclosures to NIH, the individual investigator(s) must certify to the institution and NIH that the information contained in grant applications, post-award submissions, and all other grant-related filings is accurate and complete, and also acknowledge that any false, fictitious, or fraudulent statements or claims made to NIH may subject the PI to criminal, civil, and/or administrative penalties.

---

[3] NIH Grants Policy Statement, Section 1.2, defines "other support" as "all financial resources, whether Federal or non-Federal, commercial or institutional, available in direct support of an individual's research endeavors, including but not limited to research grants, cooperative agreements, contracts, and/or institutional awards. This includes research support from foreign governments or entities. Applicants must provide updated other support information prior to award via just-in-time and are required to identify any changes in other support in each annual progress report."

[4] Public Health Service (PHS) Financial Conflict of Interest Regulations, 42 CFR 50, Subpart F, require investigators to disclose to their institution all significant financial interests including those related to funds received from a foreign institution of higher education or the government of another country.

**ZHENG's NIH Submissions**

16.     Based upon Your Affiant's review of NIH applications, just-in-time submissions and Reporting Period Progress Reports (RPPR), opportunities for disclosure of "other support" by the PI are built into the aforementioned processes.  As part of the application process, ZHENG submitted a "Change of Grantee Organization" application for NIH Grants R61 AR073049 and R01 AR059103 on 4/19/2019.  The applications called for the disclosure of any "Ongoing Research Support."  In his grant applications, ZHENG disclosed ongoing research related to other NIH affiliated projects but did not disclose his Chinese Grants, 81671611, active 1/1/2017 through 12/31/2020, and 81871224, active 1/1/2019 through 12/31/2019. Further, as part of the annual review process, ZHENG submitted a Reporting Period Progress Report (RPPR) regarding NIH Grant R01 AR059103 on 4/8/2016, 3/13/17, 1/16/2019 and 1/15/2020. The RPPR, in Section D.2.c seeks information on "Changes in Other Support."  In three of the four RPPRs, ZHENG disclosed changes to ongoing research related to NIH projects, but in all four of the submissions, ZHENG did not disclose his active Chinese grants. Based on a review of the timeframes of the four RPPR submissions noted above, the active Chinese grants should have been reported to NIH. According to NIH, no RPPRs were submitted by ZHENG for Grant R61 AR073049.

17.     Additionally, NIH reports that Grant R01 AR059103, in the amount of approximately $364,500, was initially awarded to ZHENG, as the PI, through USC, on or about 6/28/2010. The grant was subsequently submitted for a 'Change of Grantee Organization' to PSU by ZHENG on or about 8/13/2013, due to his institution transfer, and was then submitted for another 'Change of Grantee Organization' by ZHENG on or about 4/19/2019 due to his institution transfer to OSU. The Grant (7 R01 AR059103-10) was renewed and awarded to OSU

8

on or about 7/29/2019, in the amount of approximately $343,200, and listed ZHENG as the PI. The projected start and end dates of the project were on or about 7/1/2010 and 2/28/2021, respectively. Other than on one occasion, when an untimely and suspected incomplete disclosure was made via a Revision Application to Grant Renewal 2 R01 AR059103-07, no disclosure of foreign components, foreign affiliation, or foreign funding was included with either the Change of Grantee Organizations, renewals or in the original application. Regarding the aforementioned Revision Application, a revision was submitted on 3/3/2016 for an 'Administrative Supplement' to 2 R01 AR059103-07 that was originally submitted on 6/30/2014. Included in the revision application, which was submitted 612 days after the original renewal application, ZHENG listed in the 'Ongoing Research Support' portion of his 'Biographical Sketch' section that he was the PI for a SYSU Key Project from 7/1/2014 – 6/30/2017.

**ZHENG's RECEIPT OF SUPPORT FROM PRC ENTITIES**

18.    Open source research indicates that while receiving NIH grant funding, he was simultaneously employed by SYSU, working for SYSU's Third Affiliated Hospital (TAH). Specifically, TAH's Professor Home Page, viewed by Your Affiant on 5/8/2020 (www.zssy.com.cn:8080/professor/intro?id=258), revealed ZHENG's professional titles also include or have included, "Professor at Sun Yat-sen University", located in Guangzhou, Guangdong Province, China; "Director, Clinical Immunology Center, Third Affiliated Hospital at Sun Yat-Sen University"; "Expert of Thousand Talents Program"; and, "Full Professor (with tenure) and Director, Autoimmunity Center, Penn State University Hershey Medical College". Per ZHENG's OSU Biography Page, dated 7/31/2019, no affiliations were listed related to the aforementioned titles.

9

19.     Open source research conducted on 8/19/2019 identified an article dated 3/9/2014, titled, "The Third Affiliated Hospital of Sun Yat-Sen University, on the open recruitment of leading talent, Professor Songguo Zheng, research assistant" wherein ZHENG is identified as "a leading talent of the 'Hundred Talents Program' (HTP) of SYU" and that ZHENG "publicly recruited a research assistant at home and abroad for the work of scientific research laboratories and international exchanges." Further, an article dated 9/13/2018, titled, "Songguo Zheng – Hanshi Xu joint group found that rheumatoid arthritis fibroblast-like synoviocytes invade secrets" identified ZHENG as an "Expert of the National Thousand Talents Program of the China Central Organization Department".

20.     In an article viewed by Your Affiant on 5/6/2020, via SYSU's Office of Scientific Research and Development website (http://research.sysu.edu.cn/node/1778), ZHENG was selected as one of six leaders included in the sixth batch of the Pearl River Talent Program (PRTP). It is believed the sixth batch of the PRTP was selected in or around May 2017. In the announcement, it was noted ZHENG's research team name was "Clinical Immunology Precision Diagnosis and Treatment Translational Medicine Innovation Team", the research area was listed as "Biotechnology and New Medicine" and the employer was listed as the "Third Affiliated Hospital". The PRTP was launched in 2009 and supports innovative talents and teams in the Guangdong Province, China.

### ZHENG Failure to Disclose SYSU Employment and Receipt of PRC Funding

21.     ZHENG has been a professor at OSU since in or around January 2019. With respect to the time periods relevant to this Affidavit, ZHENG made Conflict of Interest (COI) disclosures to OSU on or around 2/12/2019 and 4/16/2019, via the e-COI Disclosure portal. At that time, OSU's Financial COI (FCOI) Policy, which was edited on 5/1/2018, and which was

10

the FCOI Policy in place at the time of ZHENG's grant applications, required disclosure to OSU of external financial interests that could be viewed as a conflict of interest between the professor and the University. In both disclosures noted above, ZHENG completed disclosures to OSU's Office of Research Compliance, their Office of University Compliance and Integrity and the OSU Wexner Medical Center and self-approved that he had no significant financial interest that is related to institutional responsibilities.

### ZHENG's Arrest While Attempting to Leave the United States

22.     On or about 5/22/2020, ZHENG arrived at Ted Stevens Anchorage International Airport (ANC) on VistaJet (VJT) airlines flight number 981, a private charter flight. The flight manifest indicated ZHENG was traveling on Chinese passport number E99331562. Upon arrival, all passengers deplaned. US Customs and Border Protection (CBP) officers approached ZHENG. They observed ZHENG attempt to hand off two items of carry-on luggage to another passenger. When asked by CBP, the passenger indicated the luggage belonged to ZHENG. When CBP opened these items of luggage, they identified numerous electronic devices. CBP also separated ZHENG's luggage from that belonging to the other passengers on the flight. ZHENG had a substantial amount of luggage. However, only his carry-on luggage contained any electronic devices. The affiant believes this is significant because ZHENG was attempting to hand over all of his luggage containing his personal electronic devices to another passenger, possibly in an attempt to prevent the US Government from gaining access to these items.

23.     CBP questioned ZHENG about the reason for his travel. ZHENG indicated he was "going home," per context, moving to China, and was not coming back. ZHENG was then handed off to FBI Anchorage (AN) personnel for an interview. FBI personnel asked ZHENG about the reason for his travel. At that time, ZHENG indicated he was just visiting his sick father

11

in China and would come back to the US. CBP information did not identify a return flight to the US for ZHENG.

24.    ZHENG was asked about the circumstances of his travel to the PRC on the charter flight. ZHENG indicated that his father was sick, and he needed to get back to the PRC and this was the only flight he could get. When the FBI conducted a query and confronted ZHENG with information indicating a flight to the PRC on or about 05/23/2020 was in fact available, ZHENG was unable to provide any more information. When ZHENG was told he had missed his flight to the PRC, he was upset for a very brief period of time, but quickly recovered when he learned another flight was available. ZHENG indicated a "friend" in Los Angeles (not further identified) had arranged the seat on the flight for him. ZHENG also indicated his ticket on this flight was free and when there had been an unspecified issue with a permit for the flight, ZHENG had contacted another unidentified friend who got a permit for the flight so it could operate. Your affiant believes based on the above that ZHENG was desperate to leave the United States quickly, and utilized powerful or influential friends in order to obtain a seat on a private charter flight.

25.    ZHENG was confronted with a document titled "Six teams from our school were selected into the sixth batch of 'Pearl River Talent Program' to introduce innovative and entrepreneurial teams." The article indicated the Guangdong Provincial Talent Work Leading Group Office had released the sixth batch of "Pearl River Talent Plan" (PRTP) to introduce the selected teams. As described above, your affiant believes this group was selected in May 2017. The article indicated the PRTP was a major initiative of the Guangdong Provincial Party Committee and Provincial Government to accelerate the cultivation of high-level talents and

12

implement innovation-driven development strategies. A spreadsheet in the article contained a list of individuals selected with SYSU. ZHENG was listed as a recipient and his employer was listed as TAH, per context, associated with SYSU. ZHENG acted upset and indicated they had used his name without his authorization and he was going to sue them. Your affiant believes ZHENG was over-reacting to this article in an attempt to cover up his involvement with the PRTP.

26.     Later in the interview, ZHENG indicated he had been recruited into the PRC Talent Plans but he did not accept the position because he did not want to spend nine months of the year in the PRC. In contradiction, later in the interview, ZHENG indicated he did not know he had to report his affiliation with talent plans. Your affiant believes this statement in fact indicates ZHENG's acknowledgement of participation in the talent plans, while attempting to deflect responsibility for reporting.

27.     ZHENG admitted he got money from the NNSFC but he claimed he reported it to his then employer, USC, and they had told him to go ahead with the work. FBI investigation reveals ZHENG was employed by USC from 2010 to approximately 2013. FBI investigation revealed ZHENG received another NNSFC grant in or about January 2017, valid through December 2020. If ZHENG knew to disclose this funding previously, your affiant believe ZHENG should have known he had to disclose the 2017 funding, and FBI investigation has not revealed any disclosures made by ZHENG regarding the 2017 funding.

28.     Your affiant believes ZHENG's evasive answers regarding recruitment and membership in PRC talent plans is significant because ZHENG was aware there was a potential conflict. ZHENG had received numerous admonishments from both NIH and OSU regarding conflicts of interest and had failed to disclose his overseas activities because he knew it placed

13

his NIH funding at risk. On or about May 6, 2020, ZHENG was confronted by OSU and provided an NIH letter identifying possible failure to disclose outside research support, relevant affiliations, or foreign components. The letter indicated OSU had 30-60 days to provide a written response. FBI investigation revealed ZHENG departed Columbus, OH on May 19, 2020, less than two weeks after receiving this notification. Your affiant believes ZHENG was aware of the concerns and knew he could not mitigate them. He therefore contacted a friend and was afforded a seat on a charter flight back to the PRC and packed up numerous electronic devices and a significant amount of personal items. When confronted, ZHENG initially indicated he was moving permanently, then changed his story to indicate he was visiting a sick relative and later added he was looking for a job in the PRC. Notably, when the FBI interviewed a neighbor of ZHENG in Hilliard, OH, the neighbor indicated the ZHENG's were moving. When ZHENG's wife was interviewed, she did not provide any information about ZHENG's father's illness as the reason for his travel and was evasive about moving.

29.     In ZHENG's checked luggage, a "Comfort Letter" dated July 1, 2018 from SYSU was identified. This letter was addressed to ZHENG's then-employer, PSU. The letter purported to absolve ZHENG of any obligation to SYSU and indicated there was no conflict of interest. As described above, ZHENG was listed as the PM on an approximately 600,000 yuan award (approximately $86,419 USD as of 1/1/2017) from the NNSFC to SYSU in 2017. This award is good through 12/31/2020. FBI investigation and coordination with HHS/OIG did not reveal any information indicating ZHENG disclosed this letter to any US government entity. Your affiant believes that this letter is significant for two reasons. First, it reveals ZHENG was aware there was a conflict based on his commitment and affiliation with SYSU. Second, your affiant is aware of instances wherein such letters have been provided to other individuals who are members of

14

PRC Talent Plans to provide to their employers in order to "comfort" their employers, when their obligation and affiliation with the talent plan does in fact not cease.

### There is Probable Cause that Evidence of the SUBJECT OFFENSES will be Found in the SUBJECT PREMISES

30.     On or about 5/30/2020, during an interview of one of ZHENG's research team members, Youqiu Xue, it was noted that experiments directed by ZHENG were conducted using a Flow Cytometry (FC) machine at the Dodd Rehabilitation Building (Hospital), 2nd Floor, Room S-2082.  According to Youqiu Xue, the results of the experiments were provided to ZHENG and would still be stored in/on the machine.

31.     On or about 6/17/2020, a member of OSU's legal counsel advised the FBI that university personnel entered ZHENG's OSU office on or about 6/11/2020 to identify items that could be responsive to the government's e-mail search warrant dated 5/21/2020. During that entry, counsel advised university personnel collected and preserved limited desk materials that could be instructive to the warrant and would provide those items to the FBI. Also during the entry, university personnel identified other items they deemed could be of interest to the FBI but OSU legal counsel did not consider those materials covered by the 5/21/2020 e-mail search warrant. OSU legal counsel requested the FBI obtain an additional search warrant to cover any additional items that may be in ZHENG's workspace, the workspace utilized by his research team and the labs utilized by ZHENG and his research team.

32.     On or about 6/26/2020, Valerie H. Bonham, a  member of OSU's legal counsel advised the FBI that ZHENG and his research team utilized the following lab space at the Dodd Rehabilitation Center, located at Medical Center Drive, Columbus, Ohio 43210, room numbers

15

S-2080, S-2082, S-2087 and S-2031. OSU's legal counsel also advised that ZHENG's office was located at the following address: Ohio State McCampbell Outpatient Care, Room No 503, located 1581 Dodd Drive, Columbus, Ohio 43210.

33.    As described above, ZHENG and his research team conducted work on NIH grants while employed by OSU. Research pursuant to the NIH grants was conducted in the following lab space at the Dodd Rehabilitation Center, located at Medical Center Drive, Columbus, Ohio 43210, room numbers S-2080, S-2082, S-2087 and S-2031, and ZHENG maintained an office at Ohio State McCampbell Outpatient Care, Room No 503, located 1581 Dodd Drive, Columbus, Ohio 43210. The J-1 Scholars were conducting research on NIH grants R01 AR059103 and R61 AR073049 at the direction of ZHENG. The J-1 Scholars were present in the U.S on J-1 Visas. According to OSU on 6/29/2020, J-1 Scholars Yang, Zhang and Xue submitted their resignations to OSU and OSU believes Chen may depart without submitting a resignation. In addition, according to OSU, on 6/29/2020, OSU is planning to keep the belongings of Yang, Zhang and Xue and deny them access to their offices. There is probable cause to believe that evidence of the research carried out pursuant to the NIH grants as well as materials created pursuant to the drafting of applications and other submissions to NIH will be located in the TARGET PREMISES. Additionally, there is probable cause to believe that evidence of ZHENG's association with SYSU, TAH, NNSFC, and various PRC Talent Plans will be recovered in the TARGET PREMISES based on the overlapping time frames of the receipt of the grants as well as the subject matters researched by ZHENG and funded from both PRC and NIH sources.

16

## PROBABLE CAUSE THAT EVIDENCE IS LOCATED AT SUBJECT PREMISES:

34.    This application seeks permission to seize not only physical items and computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence *that establishes how computers were used, the purpose of their use, who used them, and when.*   There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES described in Attachment A because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mails, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware,

17

and correspondence (and the date associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs or other forms of forensic evidence on a storage medium is necessary to draw accurate conclusions. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

## CONCLUSION

      35.     Based upon the foregoing, probable cause exists that ZHENG is committing one or more of the Subject Offenses. There is also probable cause to believe that evidence of those Subject Offenses will be found at the Subject Premises as described more fully in Attachments A and B.

## REQUEST FOR SEALING

36.     I further request that the Court order that all papers in support of this Application, including the Affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, tamper with or destroy evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Timothy S. Saunders
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on June 30, 2020.

Honorable _____
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A

The property to search (the Subject Premises) is any and all workspaces available to and accessed by Dr. Songguo Zheng and his research team,[5] located at The Ohio State University, Columbus, Ohio 43210, including the following lab space at the Dodd Rehabilitation Center, located at Medical Center Drive, Columbus, Ohio 43210, room numbers S-2080, S-2082, S-2087 and S-2031 and ZHENG's office located at the following address: Ohio State McCampbell Outpatient Care, Room No 503, located 1581 Dodd Drive, Columbus, Ohio 43210.

---

[5] Specifically: Lab Manager Juhua (Julie) Wang and J-1 Scholars and researchers  Qiannan Fang, Ximei Zhang, Ye Chen and Youqiu Xue.

## ATTACHMENT B

All evidence relating to violations of 18 U.S.C. § 666 and 18 U.S.C. § 1001 involving Dr. Songguo Zheng and any research team members[6] that worked with ZHENG at Ohio State University and any violations related to any entities, foreign or domestic.

This authorization includes the search of physical documents and electronic data (including data, remnant data and slack space), including the search of the following:

a. All cellular telephones, computers, software, peripherals and data storage devices, such as SIM cards, USB drives or flash memory devices in the Subject Premises, as described in Attachment A.

The seizure and search of cellular telephones and other electronic media, to include computers, will be conducted in accordance with the methodologies detained in the affidavit submitted in support of this search warrant.

Items to be seized include the following documents, records, or data, including emails, text messages, photographs, audio files, videos or location data:

a. Records and information relating to untrue statements of material fact or failures to disclosure material facts in connection to ZHENG's connection between Sun Yat-sen University, NIH and ZHENG's work at OSU.

---

[6] Specifically: Lab Manager Juhua (Julie) Wang and J-1 Scholars and researchers  Qiannan Fang (Fang), Ximei Zhang (Zhang), Ye Chen (Chen) and Youqiu Xue (Xue) (collectively, the J-1 Scholars).

b. Records and information relating to any intellectual property held or nominally held at any point by ZHENG, including but not limited to any representations by or on behalf of ZHENG.

c. Records and information relating to OSU, including but not limited to any representations by or on behalf of ZHENG regarding the terms of their employment at OSU.

d. Records and information relating to any financial transaction or other movement of any things of value, including but not limited to cash and shares of stock, to ZHENG, as well as any documents, including but not limited to Forms 1099 and Forms W-2, filled with any taxing authority in connection with those transactions.

e. Records and information relating to any communications, regarding SUBJECT OFFENSES.

f. Records and information related to any funding or outside support.

g. Records and information relating to communications with, or receipt of funds or other things of value from, any agent, instrumentality, arm, or program of the People's Republic of China.

h. Records and information relating to communication with any person or entity associated with a China Talent Plans regarding ZHENG and/or their research team.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or

2

information that is otherwise called for by this warrant, to include Flow Cytometry Systems used by ZHENG and the research team, (hereinafter, "Computer").

    a. evidence of who used, owned or controlled the COMPUTER at the time the things described in this warrant were created, edited or deleted;

    b. evidence of software that would allow others to control the COMPUTER such as viruses, Trojan horse, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and event relating to crime under investigation and to the computer user;

    e. evidence indicating the computer user's state of mind as it relates to the crime under investigations;

    f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g. evidence of counter-forensic programs and associated data that are designed to eliminate data from the COMPUTER;

    h. evidence of the times the COMPUTER was used;

    i. passwords, encryption keys and other access devices that may be necessary to access the COMPUTER;

3

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examine of the COMPUTER;

k.  records of or information about Internet Protocol address used by the COMPUTER

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies and

m.  contextual information necessary to understand the evidence described in this attachment.

This warrant authorized a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4